## State of Vermont v. Steven Chenette

[560 A.2d 365]

No. 86-135

Present: Allen, C.J., Peck, Gibson and Dooley, JJ., and Keyser, J. (Ret.), Specially Assigned

Opinion Filed March 10, 1989

238

*Jeffrey L. Amestoy, Attorney General, Susanne R. Young* and *Joseph T. Malgeri, Assistant Attorneys General,* and *Constantine Hutchins III, Law Clerk (On the Brief)*, Montpelier, for Plaintiff-Appellee.

*James W. Murdoch* and *Kurt M. Hughes* of *Wool & Murdoch*, Burlington, for Defendant-Appellant.

**Dooley, J.** Steven M. Chenette appeals his conviction for knowingly filing false Medicaid claims for medical services not rendered, in violation of 33 V.S.A § 2581(d). Defendant makes numerous claims on appeal: (1) that the trial court erred in denying defendant's motion for judgment of acquittal; (2) that the jury's verdict was contrary to the weight of the evidence; (3) that the trial court erred in denying defendant's motion for severance; (4) that the trial court made numerous erroneous evidentiary rulings;[1] (5) that it was error to admit certain "patient charts" into evidence because the seizure of the charts violated the physician/patient privilege and violated defendant's rights under the Fourth Amendment to the U.S. Constitution and Ch. I, Art. 11 of the Vermont Constitution; (6) that the trial court erred in denying defendant's motion to dismiss because the secrecy of the judicial inquest had been violated; (7) that the defendant was wrongfully denied a change of venue; and (8) that defendant was prejudiced and deprived of a fair trial because of the medical emergencies which occurred during the trial. We reject each contention and affirm.

Viewing the evidence in the light most favorable to the State, *State* v. *Kirby,* 143 Vt. 369, 370-71, 465 A.2d 1369, 1370 (1983), the facts are as follows.

Defendant practiced medicine in Swanton, Vermont, from mid-1981 through October, 1983. During this time, defendant participated in the state and federally funded Medicaid program. He then moved his practice with all his patient's records to the Health Maintenance Center in Winooski, Vermont, where he maintained an office until December, 1983. He then moved again to Florida, leaving all of his patient records with his associate, Dr. Duane Graveline, of the Health Maintenance Center. Shortly after defendant moved to Florida, the Health Maintenance Center moved to another location where it stored defendant's records along with its own records.

---

[1] Defendant's evidentiary points are that:
  (1) computer generated records were erroneously admitted;
  (2) bad acts evidence was erroneously admitted; and
  (3) evidence going to the quality of defendant's medical care was erroneously admitted.

As a health care provider in the Medicaid program, defendant received payment from the State of Vermont for medical care extended to eligible recipients. In the spring of 1983, a Utilization Control Supervisor for the Medicaid Fraud Unit of the Department of Social Welfare made a computor analysis of defendant's Medicaid billing practices. This analysis revealed unusual billing patterns. Based on the analysis, the Attorney General's Office applied for and was granted a supoena duces tecum from district court to subpoena from the Health Maintenance Center all records relating to ninety-six specified patients along with certain other records and possessions of the defendant.[2] Rather than going through all of defendant's records to find those covered by the subpoena, the staff at the Health Maintenance Center turned over all of defendant's records to the Attorney General's Office. The Attorney General's Office then analyzed selected patient records, including those covering 274 Medicaid patients and an unspecified number of non-Medicaid patients.

On September 7, 1984, a judicial inquest was held in district court in connection with defendant's case, and defendant's former secretary testified. On September 20, 1984, the State filed an information alleging ninety-six counts of Medicaid fraud through the knowing filing of false claims. The State proceeded to trial on forty-one counts and dismissed four during trial. At the close of the State's case-in-chief, seventeen counts were dismissed on defendant's motion for acquittal. Twenty counts of Medicaid fraud went to the jury, which returned guilty verdicts on seventeen of the counts. The jury acquitted defendant on three counts. Other facts are revealed below when pertinent.

-----

[2] For each patient listed in the subpoena, the subpoena demanded:

> (1) all patient records, including treatment plans, evaluations and other treatment or diagnostic records;

> (2) all records of payments by third parties for medical services rendered;

> (3) records and reports of laboratory tests and x-rays; and

> (4) all billing information.

For all of Dr. Chenette's patients, the subpoena requested:

> (1) all "[a]ppointment books, dairies, date books, appointment calendars and other records reflecting the dates of treatment or consultation. . .";

> (2) any and all reference materials pertaining to Medicaid claims; and

> (3) personnel and payable records for all employees of Dr. Chenette.

## I.

■ Defendant moved for a judgment of acquittal at the close of the State's case and at the close of all the evidence, V.R.Cr.P. 29(a), and after discharge of the jury, V.R.Cr.P. 29(c). The trial court denied each of the motions. We affirm these denials.

This Court has made clear that the sole issue raised by a motion for judgment of acquittal is whether the prosecution has introduced evidence fairly and reasonably tending to show the defendant's guilt, that is, whether the jury on that evidence would be justified in finding guilt beyond a reasonable doubt. *State* v. *Lupien*, 143 Vt. 378, 381, 466 A.2d 1172, 1174 (1983); *State* v. *Poirier*, 142 Vt. 595, 599, 458 A.2d 1109, 1111 (1983). In this case, a great deal of evidence was presented tending to show that defendant knowingly billed Medicaid for services not provided. Defendant presented evidence to prove that he kept sloppy, but honest, records, and that all of the bills he submitted were based upon actual care given or based upon a mistake. Thus, defendant claimed that no bills were "knowingly" false.

The jury must sift through the evidence and determine what to believe and what not to believe. *State* v. *Daigle*, 136 Vt. 178, 180, 385 A.2d 1115, 1116 (1978) (for jury to determine whether the evidence is believable and, if believed, what weight to accord it); *State* v. *Eaton*, 134 Vt. 205, 208-09, 356 A.2d 504, 506 (1976). Based upon the record before us, the jury clearly had ample evidence to find, beyond a reasonable doubt, that defendant systematically billed Medicaid for services not rendered and that he had the requisite knowledge of falsity. The motions were properly denied.

## II.

■ Defendant's second contention, that the jury verdict was contrary to the weight of the evidence, is also without merit. Defendant's argument is that because the jury returned verdicts of not guilty on three counts it must have been wrong in returning guilty verdicts on the remaining seventeen counts. Defendant argues that "no logical reason" exists for the different verdicts.

As noted above, the jury had the exclusive power and responsibility to judge the credibility of the witnesses. See *State* v. *Daigle*, 136 Vt. at 180, 385 A.2d at 1116. In doing so, the jury must accord the defendant a presumption of innocence. See 13 V.S.A. §

6502. In light of the responsibilities of the jury, we view the different verdicts as evidence that they did a conscientious job in evaluating the evidence. We find nothing illogical or improper in the jury's conclusions.

## III.

■ Defendant moved prior to trial to sever each of the offenses in the 96 count information, arguing that they had been joined solely because "they are of the same or similar character." See V.R.Cr.P. 14(b)(1)(A). The trial court denied the motion, finding that the State was charging a "common plan to defraud," that the State would have to offer the same evidence in each case to rebut defendant's defense of mistake or inattention, and that prejudice to defendant would not be avoided by separate trials. Defendant renewed the motion to sever at the close of the evidence as required by V.R.Cr.P. 14(b)(4)(B). It was again denied.

Defendant argues here that the motion to sever should have been granted either under V.R.Cr.P. 14(b)(1)(A) because the offenses were joined solely because they were "of the same or similar character" or under V.R.Cr.P. 14(b)(1)(B) because severance was necessary for a "fair determination of the defendant's guilt or innocence of each offense." In support of the latter ground, defendant argues that his position was greatly prejudiced by the number of counts, especially since many of them did not ultimately go to the jury even though the evidence that supported them did get to the jury.

In *State* v. *Bristol*, 143 Vt. 245, 250, 465 A.2d 278, 280 (1983), this Court found that the existence of a "single scheme or plan" defeated the defendant's automatic right to a severance. In such a case, the offenses have *not* been joined for trial "solely on the ground they are of the same or similar character." V.R.Cr.P. 14(b)(1)(A). Here, the State showed with respect to the claims that went to the jury that defendant filed a group of false bills on a specified day. The last names of the patients for claims filed on a given day started with the same letter or a letter adjacent in the alphabet. For example, all the claims filed on April 18, 1983 were for patients whose last names started with "A" or "B." All the claims submitted on May 9, 1983 were for patients whose last names started with "G." This occurred, the State alleged, because the defendant took the names from billing cards that were kept in

alphabetical order. This evidence showed a single scheme or plan rather than a number of isolated instances. Defendant thus had no absolute right to severance under V.R.Cr.P. 14(b)(1)(A).

Defendant's right to a severance must, if it exists at all, fall under the discretionary provisions of Rule 14(b)(1)(B) either because severance is "appropriate" (if determined before trial) or "necessary" (if determined during trial) to allow for "a fair determination" of defendant's guilt or innocence with respect to each offense. These provisions were taken from the American Bar Association's Minimum Standards for Criminal Justice — now the ABA Standards for Criminal Justice (2d ed. 1986). See Reporter's Notes to V.R.Cr.P. 14. Standard 13-3.1(b) provides for severance in the same terms as the rule but goes on to state that the court should consider whether, in view of the number of offenses charged and the complexity of the evidence, the jury can distinguish the evidence and apply the law intelligently to each offense. The commentary to the standard indicates that "the severance of related offenses is an issue that is committed to the discretion of the trial judge" although the intent is that the discretion not be unfettered. ABA Standards for Criminal Justice, Commentary to Standard 13-3.1(b), at 13-31. On appeal, it is the burden of the defendant to show "unfair prejudice" from the denial of severance. See, e.g., *State* v. *Beshaw,* 136 Vt. 311, 314, 388 A.2d 381, 382 (1978).

Defendant has not shown unfair prejudice or that the jury was unable to distinguish one charge from another and apply the law intelligently. While the jury must be aware of all of the alleged criminal acts as it considers each act, that would be true if each charge were tried individually. As the Commentary to the ABA Standards points out about such cases, even in the absence of a common scheme:

> Similar character offenses normally involve the repeated commission of the same offense often with the same modus operandi. With respect to this one kind of unrelated offense, evidence of each offense is normally admissible as "same crimes" evidence at the trial of the others. Therefore, the joint trial of the offenses avoids the duplication of evidence, reduces the burden on victims and witnesses, and generates other economies. At the same time, separate trials would not minimize problems of the weight of accusation and cumula-

tion of evidence, because the "other crimes" evidence would be before the jury. As a result, the joint trial of similar character offenses may often be desirable.

ABA Standards for Criminal Justice, Commentary to Standard 13-2.1, at 13-14 (footnotes omitted). As discussed below, all of the "bad act" evidence introduced in this case was admissible under V.R.E. 404(b) and would have come in even after severance. The defendant was not inhibited from testifying because the counts were joined. The fact that the jury acquitted defendant on three counts shows it was able to differentiate the counts. There was no error in denial of the severance.

## IV.

Defendant argues that the trial court made three erroneous evidentiary rulings. We address each in order.

## A.

Defendant contends that the trial court erred by allowing the State to introduce computer-compiled documentary evidence of patients' Medicaid eligibility made in the regular course of business. Defendant claims that computer-compiled data cannot be introduced unless the materials used in the compilation process are available for defendant's examination. V.R.E. 803(6) permits the introduction of business records including "[a] memorandum, report, record, or data compilation, in any form . . . ." Admission of business records is in the discretion of the trial court. See *Westinghouse Electric Supply Co.* v. *B.L. Allen, Inc.*, 138 Vt. 84, 99, 413 A.2d 122, 131 (1980).

If we understand defendant's sketchy argument here, the main objection was that the computer records were summaries without the foundation of the files and original documents supporting them. That argument was recently rejected in *United Railway Supply & Service, Ltd.* v. *Boston & Maine Corp.*, 148 Vt. 454, 458-59, 535 A.2d 325, 327-28 (1987). In that case, plaintiff offered a summary of charges for work done, prepared from original records for purposes of the litigation. Relying on *Westinghouse Electric*, 138 Vt. at 100, 413 A.2d at 132, this Court found the summaries to be admissible under V.R.E. 803(6) since the data were originally entered and maintained in the ordinary course of business activity. We noted that defendant could inquire into the

methods used to summarize the information. The defendant here had the same opportunity. There was no error in admitting the evidence.

### B.

■ Defendant also argues that the trial court erred by admitting testimony on charges later dropped, and evidence of conduct for which no charge had been brought. The State gave notice of intent to offer at trial the testimony of three witnesses, accompanied by medical records and Medicaid claims showing instances of fraud by defendant, even though no charges were filed against defendant for these instances of fraud. This testimony was admitted over objections that the evidence was cumulative and prejudicial. Defendant contends that this evidence of prior bad acts is inadmissible because it is intended to prove defendant's character to show he acted in conformity with it. See V.R.E. 404(b). At trial, the State argued that the evidence was admissible as an exception to the prior bad acts evidence prohibition of V.R.E. 404(b) because it showed a common scheme or plan, and absence of mistake. These exceptions are recognized in V.R.E. 404(b). As noted above, the State maintained the evidence was admissible to show a pattern of Medicaid fraud based on defendant's fabrication of claims for Medicaid services according to the alphabetical order in which patient billing records were kept. The evidence also addressed defendant's claim that any erroneous billings were mistakes.

■ Evidence of other bad acts is relevant and is admissible, subject to Rule 403 balancing, if it shows a plan or scheme. *State v. Catsam,* 148 Vt. 366, 382, 534 A.2d 184, 194-95 (1987). It is also admissible in a proper case to respond to a claim of the defense. See *State* v. *Recor,* 150 Vt. 40, 44, 549 A.2d 1382, 1386 (1988); *State* v. *Parker,* 149 Vt. 393, 396, 545 A.2d 512, 514-15 (1988). It must pass the balancing test of V.R.E. 403 so that it is excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." V.R.E. 403. The application of this balancing test is in the sound discretion of the trial judge. *State* v. *Larose,* 150 Vt. 363, 368, 554 A.2d 227, 231 (1988); *In re Nash,* 149 Vt. 63, 66, 539 A.2d 989, 991 (1987). We see no abuse of discretion in the case at bar.

## C.

■ Defendant argues that the trial court erroneously admitted patients' testimony regarding the quality of defendant's medical services. Again, defendant claims that this is inadmissible "bad acts" character evidence. See V.R.E. 404(a), (b). Defendant claims it was highly prejudicial and fits within none of the exceptions of V.R.E. 404(b). Further, he argues that it failed the balancing test of V.R.E. 403.

As defendant argues, a number of his patients testified that they were dissatisfied with defendant's care and would not go to him after an initial visit. The trial judge allowed the evidence as supporting the witnesses's recollection that they did not seek defendant's medical care on the dates for which defendant billed Medicaid. The court cautioned the jury to consider the evidence only for this purpose.

Defendant's competency was not an issue in the trial. The only issue was whether he had defrauded the Medicaid program. The testimony of defendant's former patients as to the poor quality of medical care was introduced to support their testimony that they did not seek defendant's medical services, not to disparage his abilities. The evidence was certainly relevant. See V.R.E. 401. It is difficult to see how it related to a character trait relevant to the issues at trial. See V.R.E. 404. Even if it related to a relevant character. trait, it was not offered to show actions in conformity with the trait, i.e., bad practice. See V.R.E. 404(b). While it might have some prejudicial effect, the balancing was within the trial court's discretion and the prejudice was minimized by the limiting instruction. There was no error.

## V.

Defendant argues, citing two grounds, that his patients' medical charts should not have been admitted into evidence. First, defendant argues that this was a violation of Vermont's physician/patient privilege. See V.R.E. 503; 12 V.S.A. § 1612. Second, he argues that the constitutional protection against unreasonable search and seizure was violated when the State seized more records than was contemplated under the subpoena duces tecum. We address these contentions in order.

## A.

█ Defendant's records were taken by the Attorney General's Office on April 24, 1984, pursuant to the consent of the custodians of the records—the doctor with whom defendant was associated and the office manager at the Health Maintenance Center. By that time, defendant had moved to Florida, and no attempt was made to obtain his permission to take the records. The Medicaid fraud unit investigators proceeded to interview the ninety-six patients identified in the original subpoena duces tecum. These patients participated fully in the investigation and did not object to discussing the consultations they had with the defendant.

On April 8, 1985, over a year after the seizure of the records and shortly before trial, defendant filed a motion to suppress the patient records because of an alleged violation of the patient privilege. Defendant made no attempt in the intervening period of time to challenge the subpoena or to obtain return of the records. Nor at the time of the motion did he show that any patient had invoked the privilege with respect to his or her records.

On June 5, 1985, the trial court ruled that the motion would be granted unless the State produced waivers from the patients showing that they consented to the use of their records. In making this ruling, the trial court rejected the State's argument that federal Medicaid law and regulations gave the State access to the records and superseded the privilege. The State produced the waivers for all patients whose records were used, and these patients testified without invoking the privilege. Defendant's argument that these waivers were too late was rejected by the trial court, and the records were admitted.

The patient privilege is set forth in V.R.E. 503, based in large part on 12 V.S.A. § 1612. The privilege belongs to the patient. V.R.E. 503(b). Thus, the patient has the privilege to refuse to disclose the confidential information and "to prevent any other person" from disclosing that information. *Id.* The privilege can be claimed by the patient or persons acting on behalf of the patient. V.R.E. 503(c). The physician "is presumed to have authority to claim the privilege but only on behalf of the patient." *Id.*

In this case, the patients did not object to the disclosure at trial of the confidential information used by the State. While the defendant has the power to invoke the privilege, it is based on the presumption that he speaks for the patient. Once it is clear that

he does not speak for the patient, his power to invoke the privilege ceases. See *In re Grand Jury Proceedings (Doe)*, 56 N.Y.2d 348, 352, 437 N.E.2d 1118, 1120, 452 N.Y.S.2d 361, 363 (1982). We do not believe this ruling should change because the patient waivers were obtained after the State obtained the information. V.R.E. 510 provides that the privilege is lost by voluntairy disclosure or consent to disclosure. Defendant made no attempt to protect the privilege for almost a year, during which the use of the records was clear at least from the judicial inquest. Thus, the failure of the State to obtain the patient waivers at an earlier date was actually caused in large part by the failure of defendant to assert the privilege.

It is also important to the timing of this case that the State subpoenaed the records here under a claim that federal and state law gave it access to the records despite the patient privilege. See 42 U.S.C. § 1396a(a)(27) (1982) (state Medicaid plan must require providers to keep records to disclose extent of services provided and to furnish information to the state regarding claims); *id.* § 1396b(q) (Medicaid Fraud Unit has access to information kept by providers); 33 V.S.A. § 2901 (state to administer a Medicaid program under federal law). Courts that have considered the question have found that the patient's privilege may be superseded or limited by the access provisions of the federal law. See *In re Grand Jury Subpoenas Duces Tecum*, 638 F. Supp. 794, 797-99 (D. Me. 1986); *In re Grand Jury Investigation*, 441 A.2d 525, 531-32 (R.I. 1982); *State* v. *Latta*, 92 Wash. 2d 812, 819-21, 601 P.2d 520, 525 (1979); cf. *Stornanti* v. *Commonwealth*, 389 Mass. 518, 526-27, 451 N.E.2d 707, 713-14 (1983). While we recognize that federal law gave the State access to some records that may be covered by the privilege, we are not prepared to say how far its right of access extended. Defendant failed totally to protect the records to force a determination of the extent of access and no patient has chosen to impose a limit on access. In view of his failure to act, defendant is in no position to rely on the patient's privilege to avoid the major evidence against him. To allow the defendant to gain any advantage from the privilege would make the privilege a protector of fraud rather than a privacy shield. See McCormick, Evidence § 105, at 258-59 (3d ed. 1984).

## B.

We now turn to defendant's argument that the confiscation of his records prior to the inquest proceeding constituted an unreasonable search and seizure. The gravamen of defendant's Fourth Amendment argument is that the State, in accepting all of the records presented to it by the Health Maintenance Center, engaged in "unconstitutional 'general, exploratory rummaging' of the defendant's files in order to identify incriminating documents to seize . . . ." *State* v. *Dorn*, 145 Vt. 606, 621, 496 A.2d 451, 459 (1985) (quoting *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 (1971)). We disagree.

The State presented the Health Maintenance Center with a valid subpoena duces tecum. V.R.Cr.P. 17(c); Reporter's Notes, V.R.Cr.P. 17(c) (rule 17(c) functions as a discovery device). The records' custodian, after consulting with the senior physician, turned over all of defendant's records. The State analyzed these records to determine whether to prosecute defendant. Assuming, arguendo, that the subpoena did not authorize the State to seize all of defendant's records, we must determine whether the Health Maintenance Center, through the senior physician and the records custodian, was authorized to consent to the search and seizure of defendant's records.

This Court has not had the opportunity to pass on the parameters of third-party consent searches. See *State* v. *Badger*, 141 Vt. 430, 444 n.3, 450 A.2d 336, 345 n.3 (1982). The burden of proof on consent issues falls on the prosecution. *Id.* at 444, 450 A.2d at 344. We must evaluate the voluntariness of consent as a factual question based upon the totality of the circumstances. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227 (1973). Third-party consent searches

> are upheld on the rationale that by entrusting his property so completely to a third party, the defendant no longer has a justifiable expectation of privacy in the property and that he "assumes the risk" that the third party will allow a search. Therefore, the defendant cannot assert the fourth amendment to bar admission of evidence seized in the search, not because his rights were waived by the third party, but because he has relinquished his privacy.

Note, 52 N.C.L. Rev. 644, 653-54 (1974) (footnote omitted). Under United States Supreme Court decisions, two elements must be present in order for a consent search to be valid when the person consenting is not the defendant. See 3 W. LaFave, Search and Seizure § 8.3(a), at 242 (2d ed. 1987). The first element is that the consenting party could have permitted the search "in his own right." The second is that the defendant has "assumed the risk" that a third party might permit a search. *Id.* See *United States* v. *Matlock*, 415 U.S. 164, 171 n.7 (1974) ("The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."); *Frazier* v. *Cupp*, 394 U.S. 731, 740 (1969) (joint user of duffel bag "clearly had authority to consent to its search"; "[p]etitioner, in allowing [associate] to use the bag and in leaving it in his house, must be taken to have assumed the risk that [the other] would allow someone else to look inside."); *Commonwealth* v. *Latshaw*, 481 Pa. 298, 305, 392 A.2d 1301, 1305 (1978), *cert. denied*, 441 U.S. 931 (1979) (validity of third-party consent search depends upon whether defendant "had a reasonable expectation of privacy" as to the contents of sealed cartons and a locked foot-locker).

In the case at bar, defendant specifically left all of his records with the Health Maintenance Center. When the Health Maintenance Center moved its offices, it treated defendant's records as it did its own. Defendant made no effort to retrieve his records, nor did he leave any instructions that they be segregated. The records were not under lock and key, nor were they in a special location. Under these circumstances, we hold that the senior physician and the records custodian had the apparent authority to consent to the search and seizure of defendant's records. Both elements of the test are present. Defendant, by leaving the records, assumed the risk that they would be disclosed. The senior physician and the records' custodian clearly had authority to disclose the Center's records. There is no error.

## VI.

Defendant next argues that the State improperly disclosed information gathered at a criminal inquest in violation of 13 V.S.A. § 5134. The statute requires that the minutes of testimony taken at an inquest "shall be the property of the state" and "shall not go out of the possession of such attorney general, state's attorney or their successors . . . ." Testimony of a witness at an inquest was incorporated in an affidavit of an investigator attached to the information in this case. Defendant claims this publication of testimony violated 13 V.S.A. § 5134 and that his case should therefore be dismissed. The State argues that use of testimony gathered at an inquest is permitted in order to show probable cause for filing an information pursuant to V.R.Cr.P. 5(c), and that the purpose of secrecy surrounding the inquest is to prevent an ongoing criminal investigation from being thwarted. Therefore, once the information is filed, the purpose served by the statute is no longer at issue.

The purpose of an inquest is to determine if criminal charges should be filed. *Hackle* v. *Williams*, 122 Vt. 168, 171, 167 A.2d 364, 365-66 (1961). Also, an inquest "relates to criminal matters to determine the existence of probable cause . . . ." *State* v. *Alexander*, 130 Vt. 54, 60, 286 A.2d 262, 265 (1971). It is an "investigatory proceeding conducted by the state's attorney to aid him in deciding whether prosecution is warranted in relation to a crime." *Id.* at 61, 286 A.2d at 266.

The whole purpose of the inquest was to determine whether to charge defendant with a crime. To argue, as defendant does, that the fruits of the inquest cannot be used to show probable cause for prosecution defeats its purpose. The testimony is the property of the State exactly for the purpose of determining whether there should be a prosecution. Thus, we find the use of the testimony did not contravene 13 V.S.A. § 5134. Even if it did, the proper remedy is not to dismiss the prosecution. *Alexander*, 130 Vt. at 61-62, 286 A.2d at 266.

## VII.

Next, defendant argues that the trial court erred by not granting his motion for a change of venue. A request for a change of venue should be granted "if the court is satisfied that there exists in the county or unit where the prosecution is pending so

great a prejudice against the defendant that he cannot obtain a fair and impartial trial there." V.R.Cr.P. 21(a).The trial court has discretion when ruling on a motion for change of venue. *State* v. *Truman,* 124 Vt. 285, 289, 204 A.2d 93, 96 (1964). Defendant points to his notoriety in Franklin County, as a doctor that treated many patients in the county and as the subject of some negative press on unrelated matters some three years prior to trial. He also points to the reports on accusations in this case. Together, in defendant's view, they required the trial court to change the venue of this action from Franklin County.

The fact that people know the defendant and that he was the subject of media interest unrelated to the trial do not in themselves create prejudice against the defendant in this criminal case. The news articles concerning this case were not particularly inflammatory. The trial judge described the jury drawing as uneventful. In addition, the trial judge gave the defendant the opportunity to renew the motion for a change of venue at jury selection, but defendant failed to do so. There is no more evidence of prejudice against defendant in this case than was found in *State* v. *Winters,* 136 Vt. 469, 470-71, 392 A.2d 429, 430 (1978) (proper denial of motion for change of venue where newspaper reporting on case was for the most part factually accurate). We are unable to find an abuse of discretion; there is no error.

## VIII.

Finally, defendant argues that he was prejudiced and deprived of a fair trial because of the medical emergencies which occurred during the trial. During the trial, a court reporter became ill and was escorted from the courtroom. A juror also became ill, and defendant went to the juror's aid. At the time of both incidents, the trial judge maintained decorum and was able to proceed with the trial. We can find no adverse impact on defendant from these incidents. Indeed, defendant's position may have been aided when he helped a juror. In the absence of prejudice, there can be no reversible error. *State* v. *Hunt,* 150 Vt. 483, 489-91, 555 A.2d 369, 373-74 (1988).

For the above reasons, the judgment against defendant is affirmed.

*Affirmed.*